# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 18, 2009

## STATE OF TENNESSEE v. LADONTE SMITH

**Direct Appeal from the Criminal Court for Davidson County**
**No. 96-A-155     J. Randall Wyatt, Jr., Judge**

**No. M2008-02095-CCA-R3-PC - Filed July 20, 2010**

Petitioner, Ladonte Smith, was convicted by a Davidson County jury of one count of first degree murder and two counts of attempted first degree murder stemming from a drive-by shooting that occurred at a market. *State v. Ladonte Montez Smith*, M1997-00087-CCA-R3-CD, 1999 WL 1210813, at *1-5 (Tenn. Crim. App., at Nashville, Dec. 17, 1999), *perm. app. denied*, (Tenn. Oct. 9, 2000). He received a sentence of life with the possibility of parole for the first degree murder conviction and seventeen years for each conviction for attempted first degree murder, to run consecutively to the life sentence. Petitioner subsequently filed a timely pro se petition for post-conviction relief, alleging, among other things, ineffective assistance of counsel. The post-conviction court held a hearing on the petition, after which the petition was denied. Petitioner now appeals. After a thorough review, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which DAVID H. WELLES, and ROBERT W. WEDEMEYER, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Ladonte Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Tom Thurman, Deputy District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Petitioner, Joe Davis Martin, and Shaun Fly Smith were arrested for their involvement in a drive-by shooting that took place on December 17, 1995, during which twelve-year-old Jermiyer Warfield was shot and killed. *Id.* at *3. At the conclusion of the trial, Petitioner was found guilty of first degree murder and two counts of attempted first degree murder. *Id.* at *1. The convictions were affirmed by this Court on direct appeal. *Id.* The facts, as summarized this Court on direct appeal, are as follows:

Arnett Hayes testified that on Sunday, December 17, 1995, he and Chevron "Chevy" McAfee were driving around in a car Hayes had borrowed for the day from William "Tiger" Harris as part of a drug transaction. McAfee wanted to go to the home of the Smith defendants' mother, and despite Hayes's preference to the contrary, he drove to the residence. When they arrived, Hayes observed a suspicious gray van sitting ten to fifteen feet from the house with its lights on. Upon seeing the van, Hayes and McAfee drove to Vira Ashby's house. Vira Ashby is Dallas Smith's girlfriend; Dallas Smith is the Smith defendants' brother. The defendants, Gary Jordan, Mitchell "Mo" Smith, Vira Ashby, and other persons were there. After a while, Hayes told the Smiths what he had seen at their mother's house. The defendants became animated and anxious to go to the house. Defendant Shaun Fly Smith asked to use the car Hayes was driving, and Hayes agreed. The defendants and Gary Jordan went into the back room and retrieved guns, coats, gloves and ski masks. Defendant Joe Davis Martin had a long rifle-like gun; Gary Jordan had a shorter gun with a pump on the end; Defendant Ladonte Montez Smith had a Tec-9 or an Uzi. Hayes did not see Shaun Fly Smith with a gun, but he thought Smith probably had one.

About an hour and a half later, Vira Ashby received a phone call. After the call, she informed Hayes that he was to say the car had been stolen and that he should not talk to the police. She also informed him not to worry, "they" would take care of the problem and the car. Ashby also informed Mitchell Smith, "[T]he problem was solved. It was through, taken care of." Ashby later received a second call. According to Hayes, the caller wanted everyone to leave the house and for the guns "and stuff" to be put up. Hayes observed others in the house put guns in the attic. Hayes spoke with Shaun Fly Smith by telephone two times. Smith told Hayes to say that he had been robbed of the car at a market down the street by individuals wearing ski masks. If Hayes

was taken to jail, he should not talk to the police, and Smith would hire an attorney for Hayes.

Several hours after he had arrived at Ashby's residence, Hayes eventually got a ride to his brother's house. Hayes did not go to the police that night, although he cooperated with them once they came to his house.

Gary Jordan, a state witness, testified that he was being held on a first degree murder charge and two attempted first degree murder charges. He was testifying for the state as part of an agreement whereby his case was severed from that of the Smiths and Martin, and he hoped to gain favorable consideration at sentencing for his truthful testimony.

In December 1995, Jordan was living back and forth between Vira Ashby's house and his aunt's house. Jordan's aunt is the Smiths' mother. About two weeks before December 17, 1995, Jordan and Shaun Fly Smith committed an armed robbery of Willie Gene, who is an associate of Phillip Patton, and someone named Cory. The heist yielded four kilos of cocaine, which had a street value in excess of $100,000. Jordan had expected to get one kilo for his participation in the crime, but he received nothing. Nevertheless, he testified he was not upset that he had not received anything.

According to Jordan, on December 16 Mitchell Smith, who is the Smith defendants' brother, was shot in the foot outside his mother's home. Jordan believed the shooting was in retaliation for the robbery Jordan and Shaun Fly Smith committed approximately two weeks earlier. Prior to Mitchell Smith being shot, Jordan had overheard Shaun Fly Smith arguing on the telephone about the robbery. After Mitchell Smith was shot, Shaun Fly Smith asked Jordan to get some ammunition, ski masks and gloves, which Jordan did.

There had been a plan for the defendants and Jordan to meet the individuals aggrieved over the drug robbery, which Jordan surmised would be a confrontation to settle the dispute through gunfire. That confrontation never took place because of police presence outside Vira Ashby's home at the time the defendants and Jordan were about to depart.

Jordan stood guard at Ashby's house all night on December 16 and the morning of December 17. When he woke up in the early afternoon, Arnett Hayes and Chevron McAfee were discussing a suspicious van they had seen in front of the Smiths' mother's house. Jordan and the defendants selected

-3-

weapons-Jordan had a 12 gauge Bryan pump shot gun, Shaun Fly Smith had a 9 millimeter Glock, Ladonte Montez Smith had an assault rifle. Martin had a .44 revolver and an assault rifle. The defendants and Jordan also took ski masks and gloves. They loaded into a car they got from Hayes. They drove by the Smiths' mother's house and through a housing project known as "Dodge City" but saw no sign of the van. They also checked some houses where some of the people associated with Phillip Patton lived. According to Jordan, they thought Phillip Patton's associates were behind Mitchell Smith's shooting.

Finally, at about 2:00 p.m., the defendants and Jordan approached a neighborhood market which was a known hangout for Phillip Patton's associates. As they rounded the corner to the store, they donned the gloves and ski masks. Shaun Fly Smith called out, "What's up, Kevin?" to Kevin Robinson, and started firing. Jordan fired next, but his gun jammed. Martin and Ladonte Montez Smith proceeded to fire, as well, as the car drove by the market.

The defendants and Jordan abandoned the car one street over from Dodge City, taking the weapons with them. They threw out as many shells as they could on the way. They ran through a yard and scaled a fence to get into Dodge City. The defendants and Jordan left the weapons in the trunk of a car belonging to one of Shaun Fly Smith's friends. A person who Jordan did not know took them to an apartment where two people named Andre and Anthony lived. Later that evening, Ladonte Montez Smith and Jordan were given a ride to a hotel, which they left within a couple of hours to go to Atlanta with Shaun Fly Smith and Tim Covington in a white BMW. Jordan lived on the lam in Atlanta, Nashville and McMinnville for a few weeks, but in January he turned himself in to the authorities.

By his own admission, Jordan was a hustler at the time of the crimes, meaning he sold drugs and committed robberies. Likewise, Jordan knew the defendant Martin to be a hustler with whom he had used cocaine. Jordan identified Tim Covington as a drug dealer who worked for Shaun Fly Smith. A police officer testified that Phillip Patton was a known drug dealer, as well.

Unfortunately, the defendant's and Jordan's actions had tragic consequences. Twelve-year-old Jermiyer Warfield, who was in the market purchasing ice cream, was killed by the gunfire. Kevin Robinson was shot in the leg; however, his injuries were not fatal. Congsuinia Holland, Jermiyer

Warfield's sixteen-year-old cousin, discovered a bullet hole in her jeans after the incident. Several other people who were in the market escaped injury, despite the extensive gunfire.

Other evidence offered by the state established that Phillip Patton owned the market at which the shooting occurred. The market was managed by Tim Miller and Marcus Jordan. Miller was inside the store at the time of the crimes.

Arnett Hayes identified the car he had loaned to the defendants and Jordan in a photographic exhibit. Several other witnesses identified this vehicle from the photograph, as well. During his testimony, Kevin Robinson identified the photograph of the vehicle in which he had seen three men wearing ski masks with guns pointed out the window. Detective Clinton Vogel, who was walking toward the market at the time of the shooting, identified the same photograph as depicting the vehicle in which he had seen four black males wearing ski masks shooting out of the car at the market. William Seats, who was walking to work at the time of the incident, heard shooting and saw a car with four people wearing ski masks and hoods inside. The car was traveling in the direction of Dodge City. He identified the car in the photographic exhibit. Billy Wright, who lives on a street behind Dodge City, saw a suspicious car park near his house. Four young, black men hurriedly got out of the car and went over the fence behind his house into Dodge City. One of the men had something under his coat. Later, the police arrived and took the car away. Mr. Wright identified the car from the photograph.

Within a short time after the crimes, officers who arrived at the scene of the shooting and the abandoned car collected evidence, including shells and bullets. A search warrant was executed at the Ashby residence on December 19, two days after the shooting. Guns and ammunition were recovered from the attic area over the kitchen. Photographs of guns and ammunition were also found, although the weapons depicted in these photographs were not recovered.

A forensic scientist testified that 7.62 x 39 cartridge casings from the crime scene were fired from the same weapon as the same type casings found in the abandoned car. These spent casings had been fired from a semi-automatic or fully automatic assault rifle. Live 7.62 x 39 rounds recovered from the Ashby residence were the same manufacturer as the spent

casings recovered earlier. Spent 9 millimeter bullets recovered had characteristics most commonly seen with firing from a Glock semi-automatic pistol. Markings at the scene were consistent with a shotgun blast, and the ammunition recovered from Ashby's house included shotgun shells. However, none of the weapons recovered from the search of the Ashby house two days after the shooting could be determined to have fired the shell casings recovered.

During Shaun Fly Smith's case-in-chief, Timothy Covington recalled that the last time he had seen Shaun Fly Smith was in a game room on a Sunday afternoon. He could not recall, however, whether this was the same Sunday as the shooting. Covington testified that he had not gone to Georgia with the defendants and Jordan on December 17 or 18, 1995, although he conceded that his former roommate owned a white BMW.

Mitchell Smith, who was serving time for drug possession, testified that he was the only person at Ashby's house on December 17 when Arnett Hayes and Chevron McAfee came by. Smith claimed the only guns and ammunition he had ever seen at the Ashby residence was the gun he himself carried. Mitchell Smith essentially denied that any of the defendants were there that day; he denied having seen Jordan at the Ashby house on any occasion.

Shaun Fly Smith took the stand and testified he had been with two of his four young children and his sister on the afternoon of the shooting. After an outing at the movies and a pizza parlor, his sister had taken his children home and he had gone to a pool hall. When he left the pool hall, he went to a girl's house in Antioch. This defendant denied any knowledge of a drug robbery. He claimed he and Jordan had been friends in the past, but they were no longer friends following an altercation in which Shaun Fly Smith beat up Jordan. This defendant denied any participation in the shootings with which he was charged. He also denied attempted intimidation of Arnett Hayes in order to keep him from testifying. He claimed a facial injury was a result of an altercation in jail, rather than a struggle with Hayes. He denied any conflict with Phillip Patton, declaring that Patton "is all right with me." He denied any prior acquaintance with Martin. Shaun Fly Smith also testified he had lived on the lam for six months before he was apprehended. He claimed he had heard a "police murder squad" was looking for him to kill him.

Joe Davis Martin testified on his own behalf. He claimed he was living with his girlfriend, Angelina Majors, in December 1995. He had been

temporarily disabled in a car wreck and was unable to work; however, his girlfriend was working at a nursing home on December 17. On that date, the defendant Martin was home cooking dinner. Miss Majors called this defendant on her breaks around 10:00 a.m., 12:30 p.m. and 2:15. She made a third call right before she left work, and she arrived home around 4:00 p.m. Martin denied any involvement with the shooting on December 17, and he denied any previous acquaintance with his co-defendants, Arnett Hayes, Gary Jordan, Vira Ashby or Dallas Smith. He denied having ever been to Ashby's house.

Defendant Martin also offered the testimony of Angelina Majors. She echoed Martin's testimony that she was working on December 17 and that she had called him at their home on her breaks and he was cooking dinner. She acknowledged that she was still romantically involved with Martin and visited him in jail.

Ebony McAllister testified that she went to Martin's and Majors' home after she and Majors got off work on December 17, and Martin was present and had cooked dinner.

Ladonte Montez Smith did not offer any evidence.

In rebuttal, the state offered evidence that Anthony McMillan, Tim Covington's roommate, owned a white BMW. Covington had been interviewed by the authorities, and he said he had last seen Shaun Fly Smith at the end of December, not on December 17, when Smith had paged him to meet at a game room. The state also offered evidence that Shaun Fly Smith had given a false name when he was apprehended.

On this evidence, the jury convicted all three defendants of premeditated first degree murder for the killing of Jermiyer Warfield. All three defendants were convicted of attempted first degree murder of Kevin Robinson. The Smiths were convicted of attempted first degree murder of Timothy Miller, and Joe Davis Martin was convicted of attempted second degree murder of Timothy Miller.

*Id.* at *1-5 (footnotes omitted).

Subsequently, on February 1, 2001, Petitioner filed a pro se petition for post-conviction relief. After the petition was filed, counsel was appointed for Petitioner. For

various reasons, several attorneys were appointed for Petitioner during the pendency of the petition. Eventually, an amended petition was filed alleging, among other things, ineffective assistance of counsel. Petitioner alleged that counsel was ineffective for a multitude of reasons, including, in part: (1) failing to interview the State's witnesses; (2) failing to locate independent witnesses; (3) failing to object to the introduction of hearsay testimony; (4) failing to call Vira Ashby as a defense witness; (5) failing to file a motion to exclude the pictures of the weapons found at Ms. Ashby's house; (6) failing to request proper jury instructions; (7) failing to object to statements made during closing argument; (8) failing to object to the jury instruction on transferred intent; (9) failing to argue that there was a separate verdict for each defendant at trial; and (10) failing to adequately cross-examine witness Arnett Hayes. Additionally, Petitioner alleged that the State withheld exculpatory evidence and permitted perjured testimony to go uncorrected at trial.

## II. Post-Conviction Hearing

The post-conviction court held a hearing on the petition. At the hearing, Petitioner testified that he was tried along with two co-defendants, including Ladonte Shaun Smith (his brother), and Joseph Martin. Another co-defendant, Gary Jordan, was not tried with them because he was going to testify for the State at trial.

Petitioner expressed his complaints regarding trial counsel. Specifically, Petitioner complained that he was told by trial counsel that a motion to sever was filed. Petitioner later discovered that there was no severance motion filed in the case. Petitioner felt that it was not good trial strategy to try the cases together because a lot of the evidence regarding the co-defendants was not applicable to his case. Petitioner stated that the testimony of Mr. Jordan was the only testimony that implicated him in the crimes and that there was nothing to corroborate Mr. Jordan's testimony.

Petitioner also complained that trial counsel failed to investigate two of the alibi witnesses that he suggested: Mario McGee and Dallas Smith. According to Petitioner, these witnesses would place him elsewhere at the time of the shooting. Petitioner admitted that he did not know if the alibi witnesses had ever been interviewed but that trial counsel did not give him a reason for failing to interview witnesses. Further, Petitioner stated that trial counsel failed to file a "Notice of Alibi" with the trial court despite advising the trial court that alibi witnesses might be presented.

Petitioner stated that a change of venue would have been appropriate in the case due to the large amount of pretrial publicity. In fact, Petitioner recalled a newspaper article that appeared on the morning of the trial. Petitioner acknowledged that trial counsel questioned potential jurors about the article, and none of the jurors stated that they would be unable to

form an impartial opinion based on the publicity. However, Petitioner felt that trial counsel should have argued for a change of venue or a postponement of the trial.

Petitioner informed the post-conviction court that trial counsel failed to challenge the testimony of Mr. Jordan even though the testimony was detrimental to Petitioner's case. Specifically, Petitioner stated that trial counsel could have more aggressively cross-examined Mr. Jordan. Petitioner further complained that trial counsel did not present any evidence on his behalf and failed to allow Petitioner to testify at trial. Petitioner stated that trial counsel told him that it was not in his best interest to testify.

Petitioner testified that trial counsel failed to file a motion to exclude the introduction of photographs of a weapon that was similar to the weapon used in the shooting. Further, trial counsel failed to object to statements Petitioner claimed were prejudicial and made during the State's closing argument. Petitioner also stated that trial counsel failed to interview State's witnesses, Arnett Hayes and Mr. Jordan.

Trial counsel testified at the hearing. At that time, trial counsel had been a criminal court judge for nearly five years. Prior to becoming a judge, trial counsel practiced law for approximately twenty years, and fifty percent of the practice was devoted to criminal law. Trial counsel testified that he had handled "thousands" of cases during private practice. Trial counsel was appointed to represent Petitioner.

In the course of the representation, Petitioner sought and obtained discovery materials from the State and met with Petitioner ten to twelve times prior to trial. Trial counsel insisted that he attempted to interview all pertinent witnesses, including State witnesses. However, trial counsel admitted that he did not interview Mr. Jordan and Harry Ashby because they were both represented by counsel and refused interviews. Trial counsel was unable to locate Arnett Hayes.

Trial counsel testified that he met with and discussed trial strategy with Petitioner prior to trial and also met with Petitioner's mother. After reflecting on the trial, trial counsel felt that there was nothing that surprised him at trial. Trial counsel opined that he had filed all the necessary motions. In fact, trial counsel testified that in his opinion, a motion for severance and a motion for change of venue were unnecessary because a Nashville jury would be appropriate for Petitioner. Trial counsel recalled that he filed several motions in limine.

Further, trial counsel testified that Petitioner made it clear to him that he did not want to testify at trial. According to trial counsel, Petitioner's sole defense was that he was with his brother (and co-defendant) Shaun Smith, at the time of the incident. Trial counsel was

unable to corroborate this alibi. Because of the weakness of Petitioner's alibi, coupled with the strength of the co-defendants' alibis, trial counsel determined that the best trial strategy would be to allow the alibis of the other co-defendants to effectively beat the testimony of Mr. Jordan. Trial counsel attempted to create as much reasonable doubt as he could through the effective cross-examination of Mr. Jordan.

Trial counsel could not recall if he failed to object to any hearsay issues. Further, trial counsel testified that the State supplied the potentially exculpatory police reports during discovery. Trial counsel stated that his policy was to show all available evidence to a defendant, so he felt secure that he would have shared the police reports with Petitioner prior to trial. Finally, trial counsel could not recall whether he requested special jury instructions or objected to the introduction of photographs of the weapon.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. In a lengthy written order, the post-conviction court denied the petition.

## III. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. T.C.A. § 40-30-110(f). However, the trial court's application of the law to the facts is reviewed de novo, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to de novo review. *Id.*; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d 572,

580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697.

This Court has previously noted that "cross-examination is a strategic and tactical decision of trial counsel which is not to be measured by hindsight." *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief" so long as counsel's "'choices are informed ones based upon adequate preparation.'" *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (*quoting Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)); *Taylor v. State*, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991).

## IV. Ineffective Assistance of Counsel

Petitioner in the case herein alleges that the post-conviction court erred in denying the petition. Specifically, Petitioner argues that trial counsel was ineffective because he: (1) failed to file or argue a motion to sever defendants; (2) failed to interview and/or present two alibi witnesses; (3) failed to file or argue a motion to change venue; (4) failed to call Petitioner as a witness at trial; (5) failed to object to various hearsay statements at trial; (6) failed to object when the State withheld exculpatory evidence from the defense; (7) failed to argue a motion to suppress testimony and pictures relating to a gun; (8) failed to interview two of the State's witnesses; and (9) failed to present a defense.

### *A. Severance*

Petitioner complains that trial counsel failed to seek a severance from the defendants that were tried jointly. At the post-conviction hearing, trial counsel stated that it was a tactical decision and felt that the motion was unnecessary. The post-conviction court noted that the decision was a trial strategy and pointed out that Petitioner actually benefitted from the joint trial "including multiple avenues of attacking the credibility of the testimony of [the State's star witness]." The post-conviction court concluded by determining that it was not "a reasonable decision" for trial counsel to seek a severance.

On appeal, this Court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by 20-20 hindsight. *See Hellard*, 629 S.W.2d at 9. Typically, allegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide

a basis for post-conviction relief. *Taylor*, 814 S.W.2d at 378. In this case, trial counsel's decision not to seek a severance was a reasoned, strategic choice. Therefore, we conclude that trial counsel's failure to file a motion for severance did not render counsel's representation ineffective. Based on the record, we conclude that the evidence does not preponderate against the post-conviction court's determination that Petitioner failed to establish that counsel's performance was ineffective in this regard.

### B. Alibi Witnesses

Next, Petitioner alleges that trial counsel failed to interview two alibi witnesses that Petitioner identified prior to trial and failed to file a "Notice of Alibi" with the trial court. At the post-conviction hearing, trial counsel acknowledged that Petitioner presented him with an alibi. Petitioner informed trial counsel that he was with his co-defendant brother. Trial counsel was unable to corroborate this alibi and determined that the alibi was not as strong as the alibis offered by the other defendants. Trial counsel felt that the best trial strategy would be to allow the alibis utilized by the other co-defendants to beat the testimony of the State's witnesses.

The post-conviction court determined that trial counsel "carefully considered all the relevant avenues of presenting a competent defense" and the decision not to present the testimony of the purported alibi witnesses was "reasonable." We agree. Generally, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit these witnesses might have offered to Petitioner's case. *Id.* Petitioner did not present the alibi witnesses at the post-conviction hearing. Accordingly, Petitioner has failed to demonstrate prejudice in this regard.

### C. Venue

Petitioner insists that trial counsel was ineffective for failing to request a change of venue prior to trial because there was pretrial publicity. At the post-conviction hearing, Petitioner admitted that trial counsel asked the jury about pretrial publicity and none of the jurors expressed a problem with rendering an impartial verdict. Further, trial counsel testified that in his opinion a change of venue was unnecessary. In fact, trial counsel opined that a Nashville jury would be more sympathetic to Petitioner.

The post-conviction court determined that the issue was addressed in open court prior to jury selection and that there was no evidence presented of juror prejudice based on the pretrial publicity. Moreover, the post-conviction court concluded that trial counsel's decision

-12-

was reasonable under the circumstances. Based on the record, we conclude that the evidence does not preponderate against the post-conviction court's determination that Petitioner failed to establish that counsel's performance was ineffective in this regard.

### D.  Petitioner's Right to Testify

Petitioner claims that trial counsel prevented him from testifying at his own trial and failed to adequately explain to Petitioner the rights associated with testifying. Petitioner further complains about trial counsel's failure to have a hearing in compliance with *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999). Trial counsel testified at the post-conviction hearing that he discussed the ramifications of testifying with Petitioner prior to trial and that Petitioner made it clear that he was not interested in testifying.

The post-conviction court noted that the trial court was not required to have a *Momon* hearing as the decision in *Momon* is not retroactive and post-dates Petitioner's case by three years. Further, the post-conviction court accredited the testimony of trial counsel. Specifically, the post-conviction court determined that trial counsel adequately informed Petitioner about his rights and provided him with the opportunity to testify and that Petitioner "affirmatively chose not to testify."

Based on the record, we conclude that the evidence does not preponderate against the post-conviction court's determination that Petitioner failed to establish that counsel's performance was ineffective in this regard. Further, as noted by the post-conviction court, *Momon* does not apply retroactively to Petitioner's case. *See Allen Dale Cutshaw v. State*, No. E2002-00438-CCA-R3-PC, 2003 WL 147025, at *7 (Tenn. Crim. App., at Knoxville, Jan. 22, 2003), *perm. app. denied*, (June 30, 2003). Petitioner is not entitled to relief on this issue.

### E.  Hearsay

Next, Petitioner alleges that trial counsel failed to object to certain hearsay statements that were offered at trial by some of the State's witnesses. Petitioner does not point to specific statements by witnesses that amounted to hearsay and were objectionable. Trial counsel testified at the hearing that repeated objections might have a derogatory affect on Petitioner's case.

The post-conviction court determined that trial counsel's inaction was a matter of trial strategy. Specifically, the post-conviction court noted that neither of the other defense attorneys objected to the alleged hearsay statements and that the lack of an objection was "reasonable" under the circumstances. Based on the record, we conclude that the evidence

-13-

does not preponderate against the post-conviction court's determination that Petitioner failed to establish that counsel's performance was ineffective in this regard.

### F. Exculpatory Evidence

Petitioner insists that trial counsel failed to alert the trial court that the State failed to provide exculpatory evidence to the defense in the form of a police report. Trial counsel testified that the State provided him with the report.

After hearing the testimony, the post-conviction court determined that the State turned over all potentially exculpatory evidence to trial counsel. Further, the post-conviction court pointed to Petitioner's failure to demonstrate that the failure to produce the police report resulted in a reasonable probability of a changed outcome at trial. Petitioner has failed to demonstrate that he was prejudiced. Therefore, he is not entitled to relief on this issue.

### G. Interview of State's Witnesses

Petitioner argues on appeal that trial counsel's failure to interview two of the State's witnesses prior to trial resulted in ineffective assistance of counsel. Trial counsel testified that he attempted to locate witness Arnett Hayes on multiple occasions with no success and that witness Gary Jordan was represented by counsel and refused to be interviewed.

The post-conviction court accredited the testimony of trial counsel and determined that his actions were reasonable. The post-conviction court also noted that witness Hayes was evading public attention prior to trial and that an attempt was actually made on his life prior to trial. Based on the record, we conclude that the evidence does not preponderate against the post-conviction court's determination that Petitioner failed to establish that counsel's performance was ineffective in this regard.

### H. Motion to Exclude Gun

Petitioner next asserts that trial counsel was ineffective because he failed to file a motion to exclude a photograph of a gun that was similar to a gun used in the crimes. The post-conviction court noted that neither of the other two defense attorneys objected to the introduction of the photograph. Further, the post-conviction court determined that the lack of objection was based upon trial strategy. Based on the record, we conclude that the evidence does not preponderate against the post-conviction court's determination that Petitioner failed to establish that counsel's performance was ineffective in this regard.

*I. Defense*

Lastly, Petitioner argues that trial counsel failed to provide a real defense at trial. Trial counsel testified that Petitioner's alibi defense was weak. Specifically, trial counsel was unable to corroborate the alibi prior to trial and in assessing the case, determined that Petitioner's testimony would probably do more damage than good. Further, trial counsel opined that the alibi testimony offered by the other two defendants would discredit the testimony of the State's star witness. Trial counsel felt that the alibi testimony advanced by the other two defendants along with an aggressive cross-examination of the State's witnesses would be the best trial strategy.

The post-conviction court determined that this was a reasonably based trial strategy. Further, Petitioner has not shown how trial counsel's failure to present any other defense was prejudicial. Based on the record, we conclude that the evidence does not preponderate against the post-conviction court's determination that Petitioner failed to establish that counsel's performance was ineffective in this regard.

**CONCLUSION**

After a review, we affirm the judgment of the post-conviction court.

THOMAS T. WOODALL, JUDGE